BANKERS POCAHONTAS COAL COMPANY *v.* MONARCH SMOKELESS COAL COMPANY *et al.*

(CC 636)

Submitted February 4, 1941. Decided February 18, 1941.

*W. Goodridge Sale, Jr., Otis E. St. Clair* and *Goody-koontz & Slaven,* for plaintiff.
*Crockett & Tutwiler,* for defendants.

ROSE, JUDGE:

The Circuit Court of McDowell County, a visiting judge sitting, certified here, on its own motion, the questions of law arising upon the sustaining of a demurrer to the bill and the amended and supplemental bill of the Bankers Pocahontas Coal Company, a corporation, against Monarch Smokeless Coal Company, a corporation, its stockholders and directors.

The purpose of the suit was to collect from the stockholders of the Monarch Company, after its dissolution and the division of its assets among its stockholders, certain rentals or royalties and other claims arising under a lease executed by the Bankers Company to a lessee, which assigned to the Monarch Company, and which obligations are claimed to have been assumed by the latter, but which accrued after the Monarch Company had, in turn, assigned the lease without the consent of the Bankers Company to still another corporation.

The controlling facts in the case, as pleaded, are relatively simple. Some time prior to 1923, the Bankers Pocahontas Coal Company became the owner of the reversion in four separate parcels of coal land in McDowell County aggregating approximately 1350 acres. Each of these parcels was covered by a coal lease at the time of its acquisition by the Bankers Company, and each of these leases, through a series of assignments, had come to be owned by the New Pocahontas Coal Company.

By deed of lease dated January 1, 1923, the Bankers Pocahontas Coal Company, as the owner of the reversion in these several parcels of land, and the New Pocahontas Coal Company, as the owner of the several leaseholds thereon, entered into a new agreement extending the then existing leases for thirty years from that date, and in some degree modifying them, the royalty being fixed

at eight cents per ton, and the minimum royalty at $5,000.00 per year.

The New Pocahontas Coal Company seems to have operated the property until January 14, 1924, when it assigned to the defendant, Monarch Smokeless Coal Company for $300,000.00 in cash and installments later paid. The plaintiff pleads that this assignment was with its consent. It did not join in the assignment. This assignment contains the following provisions:

"THE PARTY OF THE FIRST PART covenants that the party of the second part shall enjoy quiet possession of the property herein transferred; that it will pay off and discharge any and all liens upon the said property, and all the debts of the grantor herein, and save the party of the second part harmless therefrom, and, particularly, that it will pay the taxes upon said property for the taxable year 1923, and one-twenty-fourth of such taxes for 1924.

"THE PARTY OF THE SECOND PART COVENANTS that it will perform the provisions, conditions, agreements and obligations of the party of the first part under the several leases, assignments, contracts and agreements hereinbefore transferred, and save the party of the first part harmless therefrom; * * *."

The Monarch Company took possession and operated under the assignment, paying all royalties and other dues thereunder, until April 27, 1932, when it assigned the lease for $15,000.00 to the Welch Pocahontas Coal Company, a corporation, alleged by the plaintiff to be "of weak financial backing." The plaintiff says this assignment was made without its knowledge or consent, and that it protested immediately after it learned of the same, but did accept payments made by the Welch Company when tendered. The Welch Company, in turn, assumed and undertook to perform the obligations of the original lease, but fell behind in its payments, resulting in a protest from the plaintiff to the Monarch Company and notice that the latter would be held primarily responsible for any default by the Welch Company.

In November, 1934, the Welch Pocahontas Coal Company filed its bill in the Circuit Court of McDowell County praying for a receivership. A receiver was appointed, a decree of sale entered, and all its property sold June 1, 1936. The plaintiff bought the lease for $15.00, and the personal property on the premises for $6,736.93. The plaintiff's claim on the first day of June, 1936, was for $13,990.36, which it has reduced by the proceeds of these sales to the sum of $7,253.43.

The bill alleges that the Monarch Company, immediately upon the receipt of the $15,000.00 from the Welch Pocahontas Company, disbursed the same, together with the sum of $26,000.00 already in the treasury to its stockholders, being the entire capital assets of the company, and pretended to dissolve, and prays that the plaintiff may have recovery against the Monarch Company for the amount owing under the lease and against the stockholders for sums proportioned to the distribution received by them, respectively, in this manner from their corporation.

The defendant, Monarch Smokeless Coal Company, demurred and answered. The demurrer was sustained in part, and the plaintiff filed an amended and supplemental bill, whereupon the Monarch Company demurred and filed its answer thereto, and other defendants filed their separate demurrers and answers to the original and amended and supplemental bills. The grounds of demurrer are identical, and are as follows:

"(a) It is apparent from the original and the amended and supplemental bills themselves, and the exhibits filed, that there is a defect as to necessary parties.

"(b) Because there appears upon the face of the original and the amended and supplemental bills that there has been such a lapse of time since the cause of action, if any, arose and the bringing of the suit as to preclude recovery.

"(c) Because said original and amended and supplemental bills of complaint on their face show that plaintiff has no claim against these defendants until it obtains a decree in its favor on

the matters alleged against defendant Monarch Smokeless Coal Company.

"(d) Because of want of equity in said original and amended and supplemental bills."

The court overruled these demurrers on the first and second grounds, but sustained them on the third, and, on its own motion, certified here the questions of law involved.

In the brief filed here, W. H. McCulloch, W. E. Deegans, William Brown and O. C. Huffman, are pointed out as parties necessary to the bill herein. Prior to 1912, these persons appear to have become the owners of the leaseholds then covering the parcels of land here involved, and which were renewed January 1, 1923, and held such interest until some time prior to that date, when they assigned to the New Pocahontas Coal Company, since which time they have had no interest in the lease involved herein, or the claims sued on, all of which arose after January 1, 1933. No rights, either for or against the parties mentioned appear from the bill, and no necessity is seen for bringing them in.

By the second ground of demurrer, we understand the defense of either the statute of limitations or of laches to be interposed. The plaintiff pleads that by reason of the defaults of the Monarch Smokeless Coal Company since January 1, 1933, there was due to the plaintiff on June 1, 1936, the sum of $13,990.36. The suit was instituted on the 29th day of October, 1937. There is, therefore, no statute of limitations which can apply. Laches, however, relates not solely to the lapse of time, but involves a delay which has permitted such change in circumstances of the defendants as to make it inequitable to assert the claim sued for. No such intervening circumstances appear from the bill herein.

The more fundamental matters relied upon in this demurrer are contained in the third ground. In the first place, it is urged that the assignment from the New Pocahontas Coal Company to the Monarch Smokeless Coal Company does not clearly cast on the latter the payment of rents, royalties and taxes. With this contention we

cannot agree. In the second paragraph hereinbefore quoted, the Monarch Company expressly covenanted to "perform the provisions, conditions, agreements and obligations" of the New Pocahontas Company under the various leases covered by the assignment. Unquestionably the expressions "provisions, conditions, agreements and obligations" of the lessees are sufficiently comprehensive to include rents, royalties and taxes agreed to be paid. But in the preceding paragraph the New Pocahontas Company covenanted on its part to pay certain taxes, all liens against the property, and "all the debts of the grantor herein." It is argued that the "debts" of the grantor, thus mentioned, include the rents, royalties and taxes here involved. Standing alone, this construction would be possible, but, read as a part of the entire instrument, it is unacceptable. It would be rare, indeed, that the assignor of a lease for a long term would reserve to himself the burdens of the lease and give the benefits to the assignee. Moreover, the paragraph has to do with a warranty for quiet enjoyment, and apparently enumerates what is to be done, the omission of which might result in the interference with the assignee's possession. These are the payment of certain taxes and all liens and also the "debts" of the assignor. It is apparent that these debts, if unpaid, might cause trouble to the assignee, which had taken over the assets of the former owner. We are clearly of opinion that the Monarch Company, by this instrument, became obligated to pay rents, royalties and taxes thereafter to accrue on the demised premises.

The demurrants, however, insist that this obligation could not subsist against the Monarch Company except during the period it held the lease and occupied the premises; and this would be true if that company was an assignee and no more. 1 Tiffany, Landlord & Tenant, page 987; 2 McAdam, Landlord & Tenant, page 1023; *Seeburger* v. *Cohen,* 215 Ia. 1088, 247 N. W. 292, 89 A. L. R. 427; *Bonfils* v. *McDonald,* 84 Colo. 325, 270 P. 650; *Treff* v. *Gulko,* 214 Cal. 591, 7 P. (2d) 697. But where one takes a lease by assignment and also expressly assumes the payment of rent or other obligations of the lessee, he becomes

not only an assignee, but an assumptor, as well, and is absolutely bound to the lessor for the residue of the term upon the obligations assumed, whether he ever occupies the premises or not. Nor can such assumptor relieve himself of the obligations undertaken by the simple device of voluntarily transferring the leasehold to another, even though that other, in turn, assumes the obligation. It would be strange, indeed, if one who becomes bound to another in a contractual relation could, at his own whim, terminate that obligation by procuring some other person to assume it. No case has been cited or found where such an assumptor has been permitted so to extricate himself. On the other hand, courts and law writers have frequently affirmed the doctrine here announced. In *Burlew* v. *Smith,* 68 W. Va. 458, 69 S. E. 908, the grantee's assignee was held liable to the original grantor, although she had conveyed to still another. In *Kanawha-Gauley Coal Co.* v. *Sharp,* 73 W. Va. 427, 80 S. E. 781, 52 L. R. A. (N. S.) 968, Ann. Cas. 1916 E, 786, the lessee was held for the royalties notwithstanding before the accrual of the claims sued for he had transferred the lease to a corporation which assumed these obligations. "A reassignment by the assignee does not terminate his liability if, on originally taking an assignment of the leasehold, he expressly agreed to perform the covenants of the lease, though such an agreement, if made with the assignor alone, can be enforced by the landlord only in jurisdictions where a third person is entitled to sue on a contract made for his benefit." 1 Tiffany, Landlord & Tenant, page 989. "As we have seen, the assignee of a lease is liable for the rent only for the period that he is in possession, and if he assign his term and go out, his liability is thereupon determined. But this rule is subject to the exception that if the assignment to the assignee contain his express contract or covenant to pay the rent or to perform the covenants of the lease, which embrace a covenant to pay the rent, then he may be held upon his contract or covenant despite his own subsequent assignment." 2 McAdam, Landlord & Tenant, page 1026. See also, 12 Am. Jur. page 838; 42 A. L. R. Annotation,

page 1174; *Chase* v. *Oehlke,* 43 Cal. App. 435, 185 P. 425; *Hartman Ranch Co.* v. *Associated Oil Co.,* 10 Cal. (2d) 232, 73 P. (2d) 1163; *Springer* v. *DeWolf,* 194 Ill. 218, 62 N. E. 542; 56 L. R. A. 465, 88 Am. St. Rep. 155; *Wilson* v. *Lunt,* 11 Colo. App. 56, 52 P. 296; *DeLano* v. *Tennent,* 138 Wash. 39, 244 P. 273, 45 A. L. R. 766; *Pickler* v. *Mershon,* 212 Ia. 447, 236 N. W. 382; *Consumers' Ice Co.* v. *Bixler,* 84 Md. 437, 35 Atl. 1086; *Barde* v. *Portland News Co.,* 152 Ore. 77, 52 P. (2d) 194.

This liability of an assignee and assumptor of a lease is sometimes said to be based on the supposed privity of estate or contract between the lessor and such assignee. Of course, no privity of estate between the plaintiff and the Monarch Company survived the latter's assignment to the Welch Pocahontas Company. Whether strict privity of contract ever existed between them may be questioned. The attitude of this Court on the question was probably expressed by Judge Poffenbarger, in *Comley* v. *Ford,* 65 W. Va. 429, 64 S. E. 447, 448, as follows:

> "That there can be no recovery from the assignee of the lessee until either privity of contract or privity of estate is established on the part of the assignee, is uniformly asserted by the authorities. In *Railroad Co.* v. *McIntire,* 44 W. Va. 210, the assignee is said to be liable to the lessor because of his privity of estate. If there were an express covenant on the part of the assignee to pay the rent, there would be privity of contract."

But there is a broader equitable principle upon which this bill can stand, namely, the right of a third party to enforce in equity a contract between other parties, not for his exclusive benefit. This principle is not limited to cases of vendor and vendee, or lessor and lessee, and assumptors thereunder, but is of general application. "The right of a third person to enforce a contract made for his benefit, was recognized in equity at an early date, and has been constantly enforced in most jurisdictions." 4 Page on Contracts, section 2405. "The law, therefore, now generally allows a direct action by the creditor

beneficiary against the promisor without joining the promisee, instead of requiring a procedure like garnishment or a suit to realize on an asset of the debtor not available to seizure by ordinary legal process." 2 Williston on Contracts, section 362. In *Chitwood* v. *Collins*, 122 W. Va. 267, 8 S. E. (2d) 830, decided in this Court since the decision certified herein was rendered, it was held that a donee beneficiary of a contract between two other persons could enforce that contract in equity for his own benefit. This case would appear definitely to align this jurisdiction with the many others which have sustained the enforceability by a third person beneficiary of his rights in a contract between others. If a donee beneficiary can enforce such a contract, no reason is perceived why a creditor beneficiary may not do so.

It is conceded, apparently that if the plaintiff is entitled to recovery against the Monarch Company, it can have a proportionate recovery against the stockholders of that company who received its capital fund by way of liquidating dividends. "Where the assets of a dissolved company have been distributed among the stockholders, a creditor having an enforceable cause of action against the corporation may hold the stockholders liable to the extent of the assets received by them." 16 Fletcher, Cyc. Corporations, section 8161. This right to proceed against the stockholders does not appear to have been barred by any proceeding for dissolution shown by the bill.

It is also argued that the bill fails to show that there remains in the land any minable coal for which royalties, minimum or otherwise, should be paid. The bill shows a coal acreage of 1350 acres partly mined out, but covered by a new lease dated January 1, 1923, providing for operations thereunder for thirty years. As late as April 27, 1932, the Monarch Company operated under this lease, and on that day transferred the lease, with its obligations to operate, to another company, from which it may be presumed there was still minable coal available. In November, 1934, a receiver was appointed to carry on these operations, indicating that on that day there was still unmined and available coal. And continuously to June 1,

1936, there is no intimation by any party in interest that the coal was exhausted or the mine abandoned. If, therefore, a showing of minable coal is necessary in the bill of complaint, it thus appears. However, we are of opinion that the exhaustion of the subject matter of the lease is a matter to be shown in defense by those sued for rentals and royalties, rather than to be negatived by a plaintiff who, on the face of his lease, is entitled to rentals or royalties for the period covered.

The last ground of demurrer is general, and specifies no alleged defect in the bill. It need not be discussed.

We, therefore, affirm the action of the trial court in overruling the demurrers on the first and second grounds, and reverse his action in sustaining the demurrers on the third ground, and direct that the demurrers and each of them be overruled *in toto*. The cause will be remanded for further proceedings in accordance with this opinion.

*Affirmed in part; reversed in part; remanded.*